LANIER, Judge.
ON REMAND
This is a suit for damages in tort arising out of an automobile accident which resulted in a fatality. The parents of the deceased driver claim damages for wrongful death. After a trial on the merits, the jury found the defendant driver was not negligent. In accordance with the jury’s finding, the trial court rendered judgment in favor of the defendants, dismissing plaintiffs’ demands. Plaintiffs took a devolu-tive appeal to this court. This court, in an unpublished opinion, affirmed with a dissent. The majority held that the jury verdict that the defendant driver was not negligent was not manifestly erroneous and declined to rule on the plaintiffs’ assignments of error concerning the admission of the results of a blood alcohol test of the deceased because it pertained to the issue of the deceased’s comparative negligence and was not relevant to the defendant driver’s fault. The dissenter disagreed with the majority’s view that the results of the decedent’s blood alcohol test were not relevant to the fault of the defendant driver and expressed the opinion that the evidence was insufficient to establish by a preponderance of the evidence that the blood tested was that of the decedent. On application of the plaintiffs, the Louisiana Supreme Court peremptorily granted a supervisory writ with the following per curiam:
The court of appeal declined to address the issue of the admissibility of the results of plaintiff's second blood alcohol test on the basis that the results were only relevant to plaintiff’s comparative negligence in this intersectional collision. Because there was a reasonable basis for the jury to find defendant (who was faced with a stop sign at the intersection) at least concurrently at fault, one cannot reasonably conclude that the admission of the test results, if erroneous, could not have affected the jury’s finding that defendant was totally free of fault. Accordingly, the judgment of the court of appeal is set aside, and the case is remanded to the court of appeal to rule upon the admissibility of the test results and to reconsider the fault of the parties in the light of that ruling.
[McLaughlin v. Fireman’s Fund Insurance Company, 533 So.2d 340 (La.1988).]
FACTS
Kirk McLaughlin (McLaughlin) was killed on April 10, 1983, when the 1978 Chevrolet Monza automobile he was driving collided with an 18-wheel tractor-trailer rig (the truck) operated by Howard Glasper and owned by Hammond Sandblasting, Inc. *329 McLaughlin’s parents, Clarence “Red” McLaughlin and Peggy Crisp McLaughlin (plaintiffs), filed this wrongful death action against Glasper, his employer William McNabb, d/b/a B-Line Truck Services, McNabb’s insurer, Fireman’s Fund Insurance Company, and Hammond Sandblasting, Inc.[1]
This accident occurred at approximately 7:30 p.m. on Louisiana Highway 1040 (Old Baton Rouge Highway) at its intersection with Stein Road in Tangipahoa Parish. La. 1040 runs east and west. Approximately 900 feet to the east of the intersection where the accident occurred is an overpass over Interstate 55. Approaching the intersection from the east, as McLaughlin did, a motorist would encounter a straightway, the overpass, then a downgrade and curve to the right. Glasper approached La. 1040 from Stein Road and began to turn left onto La. 1040 eastbound. Before he could complete the turn, his vehicle was struck by McLaughlin’s vehicle, which had been proceeding westbound on La. 1040.
Louisiana State Trooper Brad McGloth-ern, who investigated the accident, testified that when he arrived at the scene the trailer blocked all of the eastbound lane and extended six to seven feet into the westbound lane. However, he stated there was still ample room for an automobile to pass in the westbound lane. McLaughlin’s vehicle was almost entirely in the eastbound lane. Based on the location of debris in the road, he determined the point of impact to be in the eastbound lane. He further determined, based on the absence of skid marks or yaw marks[2] and the type of damage to McLaughlin’s vehicle, that McLaughlin had been traveling at approximately 55 miles per hour immediately before impact. However, he stated there was really no basis for him to draw an exact speed.
McGlothern further testified that, when he arrived at the scene, McLaughlin’s body was still in the car. He checked for a pulse but found none. While leaning into the car to check for a pulse, he smelled “an odor of an alcoholic beverage” in the vehicle (along with antifreeze and other odors). He requested that blood samples be taken from McLaughlin’s body for analysis for blood alcohol content.
Two blood samples were subsequently taken. One of the samples was sent to the Louisiana State Police Crime Laboratory, but the lab was unable to analyze it due to “apparent exposure to extreme heat.” The results of a second sample, analyzed by the Pathology Laboratory in Metairie, admitted over plaintiffs’ objections, showed McLaughlin’s blood alcohol content to be .20.
Troy Milton, a passing motorist who stopped at the scene after the accident, testified that when he arrived the cab of the truck was in the eastbound lane and partially onto the shoulder, and the trailer was across the entire eastbound lane and half of the westbound lane. He stated there was not room for a car to pass in the westbound lane.
Paul Knight, who lived a block away, went to the scene after hearing the noise of the collision. He testified the trailer was blocking both lanes and that it was impossible to pass on the westbound shoulder because of a steep ditch. He further testified that he saw lights on the cab but not on the trailer.
Senior Trooper John E. Blunschi, III testified for plaintiffs as an expert in accident reconstruction. Blunschi was assigned by the state police to reinvestigate this accident after plaintiffs complained about McGlothern’s failure to issue a citation to Glasper, and a review of the accident report and photographs by Donald Keating, Commander of State Police Trooper L in *330 Hammond, showed that there was a question about Glasper’s negligence. Blunschi testified that, based on the absence of yaw marks and the type of damage to the McLaughlin vehicle, in his opinion McLaughlin was not traveling at a high or excessive rate of speed immediately before impact but was traveling approximately 55 miles per hour at the point of impact.
Blunschi testified that, even if McLaughlin had been going 65 miles per hour, or approximately 100 feet per second, it would have taken nine seconds for him to travel from the top of the overpass to the point of impact. However, it should have taken only six to seven seconds, at most, for Glasper to pull his truck from its position at the stop sign completely into its proper lane on La. 1040. He thus concluded that McLaughlin must have been well past the top of the overpass before Glasper entered the intersection and that Glasper “quite obviously failed to yield the right of way.”
Based on these reconstructed facts and the blood alcohol analysis which showed McLaughlin’s blood alcohol level to be .20, it was Blunschi’s opinion that the accident was caused by a combination of McLaughlin’s intoxication and Glasper’s failure to yield.
Defendants’ reconstruction expert, retired police officer Earle H. Boudreaux, testified that McLaughlin was traveling between 55 and 65 miles per hour, but closer to 65 miles per hour, immediately before impact. He opined that the accident was caused by McLaughlin’s intoxication because at .20 blood alcohol level “everything' that it takes to drive a car is grossly affected.” He further theorized that, due to intoxication, McLaughlin might have passed out while driving and lost control of the vehicle.
Dr. Monroe Samuels, a forensic pathologist and toxicologist, testified that at .20 blood alcohol level, McLaughlin would have been “significantly impaired insofar as his capabilities of operating a motor vehicle.” Samuels stated that McLaughlin’s reaction time, coordination, vision, and many other sensory and motor capabilities would have been impaired, including his ability to adjust his vision from far objects to near objects, and his ability to adapt from oncoming bright headlights to immediate resulting darkness.
Glasper, the only surviving eyewitness to the accident, testified that it was a dark but clear evening. He stated that, when he reached the intersection, he stopped at the stop sign on Stein Road and looked both ways. He stated further that he could see clearly all the way to the overpass and saw no cars. As he pulled into the intersection, Glasper stated he glanced toward the overpass again and still saw “no one coming.” When Glasper got half of his trailer onto the Old Baton Rouge Highway, he saw McLaughlin’s headlights for the first time, coming at him in the eastbound lane. He stated that McLaughlin then went back into his proper lane, only to come back into the wrong lane again on a collision course with the cab of Glasper’s truck. Glasper stated that he then steered toward the eastbound shoulder in order to avoid a head-on collision. Glasper stated that, just as he got the cab of his truck onto the shoulder, McLaughlin’s car, now back in the eastbound lane, collided with his trailer. While Glasper could not say exactly how fast McLaughlin was driving, he did say that it appeared to be “pretty fast.”
Boudreaux testified that Glasper’s version of the accident, assuming the higher rate of speed of McLaughlin’s car, was not inconsistent with his calculations of distance and times involved. In addition, Bou-dreaux testified, in pertinent part, as follows:
Q You also heard Mr. Glasper testify about what he was confronted with and how he made his maneuver, did you not?
A Yes, sir, I did.
Q What is your opinion, Mr. Boudreaux, about what the driver was faced with and how he attempted to move to the shoulder of the road; is that what you would expect given the circumstances that the driver faced?
MR. CURET:
May it please the Court, which driver?
MR. BREEDLOVE:
*331 I beg your pardon.
BY MR. BREEDLOVE:
Q I am talking about Mr. Glasper.
A Yes, sir. Once he was in the position where he realized that a vehicle was approaching him and there was a possibility of a head-on collision, he made every effort to try and reach the shoulder of the road as much as possible; and I think at the same time being aware of the fact that there was a chance of a head-on collision in trying to get off the road. All of this time you have to recall that he is shifting through a total number of gears, fourteen or fifteen gears. I think he had said in his testimony he was into third gear, then he had to reshift when he realized what was happening. It is a complicated task that he was trying to perform and still get the truck over to the shoulder of the road. It is a very difficult task, but everything he did is in keeping with good defensive driving and with good professional driving tactics. He made every effort to get out of the way. Unfortunately one of the things that happens in a situation like this where he is attempting to steer away from the point of impact is that as he moves to the right or steers to the right to reach the shoulder of the road, he changes the direction of the cab of the truck. He then loses some of the forward momentum of the trailer so that the trailer doesn’t move out of the way as quickly as it could if he had just kept on a straight line and just went up the road, you know, with the chance of a head-on collision.
Q Mr. Boudreaux, with the Court’s permission, I would like for you to come down here and on this diagram demonstrate that maneuver and the way the trailer would swing when the truck driver makes such a movement.
A Okay. The trailer is not going to swing that much. What happens is that the action of the trailer is altered. As he pulls out in this fashion, he reaches a point in here where he says he saw the other vehicle approaching and he decides to go to the shoulder of the road. If he continues straight, the trailer tracks with him and goes right around the lane. Once he alters the path of the tractor to try and reach the shoulder, the tractor then begins to-move this way more quickly than it moves forward. You have to realize how the two vehicles are hooked up. There is a connection between the two, a single pivot point, so when he turns his tractor this way instead of the trailer tracking straight ahead as it would if he had pulled straight ahead on the road, the lead part of the tractor then begins to track behind the trailer which leaves the rear-end out a little longer than it would be if he made the straight pull out like this, and that is what he is faced with when he decides to alter his course and trying to get on the shoulder of the road to avoid a head-on collision.
Q And in making that maneuver and facing the situation that you suggest and he described, that is, the possibility of a head-on collision, is there any other safer maneuver that he could have made in an effort to avoid this collision?
A No, sir.
ADMISSIBILITY OF DECEDENT’S BLOOD ALCOHOL TEST
(Assignments of Error Numbers 3, 4 and 6)
On remand, the plaintiffs assert (1) they properly preserved their chain-of-custody objection to the blood test, (2) the admissibility of the decedent’s blood test is relevant to the issue of the fault of the defendant driver, (3) pursuant to the authority of Bufkin v. Mid-American Indemnity Company, 528 So.2d 589 (La.App. 2nd Cir.1988) and the cases cited therein, a proper chain-of-custody was not established for the admissibility of the blood test, and the trial court erred by allowing the test results into evidence, (4) the erroneous admission of the blood test result interdicted the jury’s verdict finding no fault by the defendant driver, (5) the record is complete, and this court *332 should make a de novo determination of the preponderance of the evidence, and (6) in the absence of the decedent’s blood test result, there is no evidence of decedent’s fault, a preponderance of the evidence shows the defendant driver was solely at fault, and the jury verdict of no liability should be reversed and judgment rendered in favor of the plaintiffs for appropriate quantum awards. The defendants respond (1) that a proper chain-of-custody was established, (2) the decedent’s blood alcohol test result was properly admitted into evidence, (3) the jury’s verdict that the defendant driver was not negligent is correct, and (4) the judgment of the trial court should be affirmed.
La.C.C.P. art. 1635 provides as follows:
Formal exceptions to rulings or orders of the court are unnecessary. For all purposes it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him. [Emphasis added.]
The reason for this rule is to afford the trial court an opportunity to prevent or correct prejudicial error. Calderon v. Johnson, 453 So.2d 615 (La.App. 1st Cir. 1984); Bertoli v. Flabiano, 116 So.2d 76 (La.App. 1st Cir.1959). Further, an appellate court will only review the grounds for objections which were urged before the trial court; different grounds cannot be asserted on appeal. Guedon and Associates, Inc. v. Haik, 533 So.2d 1256 (La.App. 4th Cir.1988); W.L. Somner Company, Inc. v. Pacific-Atlantic Oil Company, 522 So.2d 1335 (La.App. 2nd Cir.1988); Moore v. Clark, 517 So.2d 293 (La.App. 1st Cir. 1987); Cooper v. AMI, Inc., 454 So.2d 156 (La.App. 1st Cir.), writ denied, 459 So.2d 539 (La.1984).
Dr. Maxwell testified that, after placing the blood sample “in the hands of the pathology laboratory”, he would “receive a result.” At this point, counsel for the plaintiffs objected “to any further testimony until we have established what the line or chain of evidence is.... ” [Emphasis added.] Counsel for the defendants responded he was “not going to go further as far as introduction of documents as far as the blood sample” and that “the reason for my question is to identify what he [Dr. Maxwell] would receive back from the lab in the normal course of events.” Dr. Maxwell then testified he did receive a result back from the- pathology laboratory. The trial court judge was not presented with a chain-of-custody question at this time and, thus, did not make a ruling on such.
Thereafter, out of the presence of the jury, counsel for the plaintiff objected to the blood test evidence on the basis of noncompliance with La.R.S. 32:661 et seq. During the course of this hearing, counsel for the defendants asserted the evidence was admissible and “the chain of evidence will be shown to have been valid.” The trial court judge took this objection under advisement.[3]
Testimony taking was resumed and Chigoy was called as a witness. Exhibit D-8 was identified as a physician’s request for analysis, and Exhibit D-9 was identified as a copy of a Pathology Laboratory log book entry. Counsel for the defendants offered these exhibits into evidence and specifically called for objections. Counsel for the plaintiffs objected “on the basis of this witness [Chigoy] not identifying himself as having made these entries in this record” and noted his “objection may go to the probative weight of the thing....” Counsel for the plaintiffs did not raise a chain-of-custody objection to this evidence. Counsel for the defendants responded that Chigoy was the administrator in charge of analyzing and administrator of blood samples. The trial court judge noted that Chi-goy “properly identified the record as be *333 ing a part of the records of the Pathology Lab” and ruled the evidence was admissible. The trial court judge was not called upon to make a chain-of-custody ruling on this evidence and did not do so. Exhibit D-9 shows Kirk MacGloughlin’s blood alcohol level as 0.20. The objection to Chigoy’s status as custodian of these records has not been raised in this appeal and, thus, has been waived. Uniform Rules—Courts of Appeal, Rule 2-12.4.
Chigoy next identified Exhibit D-10 as a gas chromatograph graph of the blood sample. Exhibit D-10 shows McGlough-lin’s blood alcohol level at 0.204. Chigoy then identified Exhibit D-ll as a report of the test results performed by himself. The name on Exhibit D-ll is “McSloughh, Kirk.” Counsel for the plaintiffs objected to Exhibit D-ll because “there was a mispronunciation of the name” and “on the basis of the question being leading ... because that name is not on this document.” Chigoy then testified that the discrepancy was a typographical error on Exhibit D-ll, and the exhibit had the correct (and unique) access number of 471585 to identify it with the Kirk McLaughlin blood sample and the correct account number (1855) for Dr. Maxwell. Chigoy also noted that Dr. Maxwell’s name on the exhibit was misspelled as Madwell. Counsel for the defendants then offered to file Exhibits D-10 and D-ll into evidence and specifically called for objections. Counsel for the defendant reurged “the same objection” that “the particular piece of evidence called exhibit eleven ... does not bear the name of Kirk McLaughlin”, that “the witness is not the person who is able to testify as to how that occurred”, and that he would “object to the introduction of that until this is satisfactorily explained.” Counsel for the plaintiffs raised no objection to Exhibit D-10, and Exhibit D-10 [showing a blood alcohol level of 0.204] was, thus, admitted into evidence without objection. The objection to Exhibit D-ll related to the proper spelling of McLaughlin and was not the chain-of-custody objection urged during the testimony of Dr. Maxwell. After hearing the plaintiffs’ objection and the defendants’ response, the trial court ruled as follows:
I think a satisfactory explanation has been made of the name. It is a mere case of misspelling. The lab number is correct and the physicians [sic] number or account number is correct. I am going to admit it.
The trial court judge was not called upon to rule on the chain-of-custody objection and did not do so. The above objection made to Exhibit D-ll in the trial court has not been raised in this court and, thus, has been waived.
Chigoy then testified about how he performed the gas chromatograph test on the blood. When Chigoy was asked to give the results of his test, counsel for the plaintiffs objected “for the reasons stated earlier” that “this test or the testing procedure which he used while the device may be acceptable was not done according to the law of Louisiana in this particular test.” Counsel for the plaintiffs did not elaborate on how the “test” or “test procedure” was not in accordance with Louisiana law or what Louisiana law was applicable. Counsel for the defendants responded that “the reference to documents previously admitted is moot at this point.” The trial court ruled the testimony was admissible without stating why. Because Exhibits 9, 10 and 11, showing McLaughlin’s blood alcohol level had already been introduced into evidence at this time, further objections to this type of evidence had been waived. See, for example, Citizens Bank and Trust Company v. Robertson, 482 So.2d 867 (La.App. 2nd Cir.), writ denied, 486 So.2d 754 (La.1986); Geisler v. Louisiana Power and Light Co., 346 So.2d 339 (La. App. 4th Cir.), writ denied, 349 So.2d 879 (La.1977).
After carefully reviewing the pertinent portions of the transcript (attached hereto as Appendix A) and Exhibits 8 through 11 (attached hereto as Appendix B), we conclude (1) the plaintiffs did not preserve a chain-of-custody objection for appellate review, (2) Exhibit 10 was admitted into evidence without objection, (3) the objections raised in the trial court to Exhibits 9 and 11 have not been raised in this *334 appeal, (4) Exhibits 9, 10 and 11 were properly admitted into evidence in the trial court, and (5) when Chigoy gave his testimony about the blood test result, the chain-of-custody objection had been waived by the proper admission into evidence of Exhibits 9, 10 and 11. The trial court judge was never required to rule on the chain-of-custody objection with reference to Exhibits 9, 10 and 11 and did not do so. Because the trial court judge was not required to rule on the chain-of-custody issue before Exhibits 9, 10 and 11 were admitted into evidence, he was never given an opportunity to correct or prevent a prejudicial error. Accordingly, it would be unjust to allow this issue to be presented for the first time on appeal.
These assignments of error are without merit.[4]
DEFENDANT DRIVER’S FAULT
(Assignments of Error Numbers 1, 2, 7 and 8)
Plaintiffs contend the jury’s finding that the defendant driver, Glasper, was not negligent is clearly wrong and manifestly erroneous.
The jury obviously accepted the testimony of Glasper as to how the accident occurred. This is a factual finding which shall not be disturbed on review unless it is determined to be manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The examination by this court for manifest error must give great weight to the factual conclusions of the trial court. Where there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed, even though this court may deem other inferences and evaluations are as reasonable. Canter v. Koehring Company, 283 So.2d 716 (La.1973). After again thoroughly reviewing the evidence pertinent to the issue of Glasper’s fault, we cannot say that the jury's finding is manifestly erroneous.
These assignments of error are without merit.[5]
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. The cost of this appeal is assessed against plaintiffs.
AFFIRMED.
CARTER, J., dissents and will assign written reason.
APPENDIX A
[The questioned blood sample was taken by Dr. Ralph Maxwell, in his capacity as coroner of Tangipahoa Parish. Dr. Maxwell gave the following pertinent testimony at the trial:]
BY MR. BREEDLOVE:
Q Go on, Doctor.
A I use routinely a blood alcohol kit with an intracardiac needle which is injected, well, injected into the heart area and blood is withdrawn; then the blood is injected into a gray-top tube, containing sodium fluoride. It is injected into this tube. This tube .is then labeled. I keep one and write the name of the patient on it, write my name on it, and the date. One gets put back in here, and then marked on the outside for the state police and it is sealed.
Q And what happens to the second one that you took, Doctor?
A The second one goes to the pathology lab that is given to them, and they take care of it.
Q And the second blood sample would it have been taken in the same manner and fashion?
A The same tube, I just draw one tube and it handles both of them.
*335 Q So that you now have two tubes, two vials of blood drawn from the same heart, the same cavity; is that correct?
A That is correct.
Q Would you have personally labeled each of those blood vials with your name and Kirk McLaughlin’s?
A I did, and the date.
Q Now, the second blood vial, Doctor, the first one was given to the state police, as I understand your testimony.
A Yes.
Q And the second one you indicated was delivered to the pathology lab.
A That is correct.
Q Excuse me. Let me back up. You mentioned a term that the jury may not be familiar with, that is, the location from which you extract the blood from the body. What was that term, sir?
A I use the heart as a holding tank. Once the patient dies, of course, peripheral blood is going to clot, and when we get to the scene of an accident or when we do the autopsy, wherever we end up doing the blood sample, the heart is usually such a large organ and it contains such a volume of blood that it hasn’t coagulated in the heart, so I can draw and pull back and take out an un-clotted sample of blood, and in this manner get an accurate reading of what the blood was like all through the body because the heart has circulated all this blood up until the time a patient dies; therefore, this gives us the closest to proximity to actual contents of the blood.
Q Now, Doctor, after having taken both of these blood samples, having delivered the first one to the state police for examination, you indicated again that you delivered the second one to the pathology lab. How did you go about doing that, sir; how did you go about delivering or sending that second vial to the pathology lab?
A I label it and hand it to the pathology laboratory person who puts it in the refrigerator and gets this sample labeled with the name of the. patient, the time, and my name and my number, which I don’t remember, but I think it was 1855 for billing purposes is sent to the pathology laboratory. It is carried by them, they do—
MR. CURET: [counsel for the plaintiffs]
I object to any testimony about what they do at the laboratory, Dr. Maxwell. MR. BREEDLOVE: [counsel for the defendants]
We will get to that in a moment.
BY MR. BREEDLOVE:
Q Doctor, you mentioned a number. Is that an identifying number for an account that you have with the pathology lab?
A That is correct. That is the one thing they never mistake.
Q Now, when you say that, you mean they may mistype the spelling of names, but they don’t get the number wrong; is that correct?
A The billing number never errors.
Q That billing number would have been placed on the blood vial that was placed in the possession of the pathology lab courier; is that correct?
A Correct.
Q And you personally did this?
A Place it in the hands of the pathology laboratory, there is a pathology collection area in the hospital. I place it in their hands.
Q Now, of course, from there it goes for testing, et cetera, and then what happens in the normal course of events?
A I receive a result.
MR. CURET:
Your Honor, I object to any further testimony until we have established what the line or chain of evidence is, chain of custody is in this case. The doctor has given testimony that he gave it to the path lab at the Seventh Ward Hospital, not the lab that made the tests.
MR. BREEDLOVE:
I understand, your Honor, I am not going to introduce any—
A It is the same lab.
MR. BREEDLOVE:
*336 I am not going to go further as far as introduction of document as far as the blood sample with this witness; but the reason for my question is to identify what he would receive back from the lab in the normal course of events.
BY MR. BREEDLOVE:
Q And in fact, did you receive a result back from the pathology lab?
A I did.
[[Image here]]
TAfter Dr. Maxwell completed his testimony, a hearing was held out of the presence of the jury, and the following, in pertinent part, occurred:]
MR. CURET:
Your Honor, at this time I wish to move that the evidence presented by Dr. Maxwell with regard to the taking of the blood sample does not comply with nor qualify the sample taken to be used in a civil case in the determination of a blood alcohol level of one of the parties in the litigation. Specifically I refer to Revised Statute 32, Section 661 and following, 661B particular which requires that any person who is dead, unconscious or otherwise in the condition rendering him incapable of refusal shall be deemed not to have refused, not to have withdrawn a consent provided by Section A. It says the test may be administered subject to the provisions of R.S. 32:662. This particular section pertaining to the taking of blood contains both criminal and civil components. Now the Court in Mullins versus Department of Public Safety, 327 Southern 2nd, 492, says that this act applies to civil cases. The ease in question had to do with a person suing the department, well, to make a long story short, they hadn’t gotten the regulation from the department for the use of breathalizer tests, and the Court threw the test out as invalid. The same thing would apply with the blood sample test. In connection with the argument that we make, we offer and file into evidence, I have a copy for you guys, a certified copy of the regulation which have been promulgated by the Department of Public Safety which would generally identify it in the State Register as being in Volume six, Number 11, the regulation being November 20,1980, and it is at pages 660 and 663 of the Register.
MR. BREEDLOVE:
Counsel can I see it?
MR. CURET:
Yes, sure. Let me give you copies. MR. BREEDLOVE:
Your Honor, my objections in opposition to this motion which appears before you now as a motion in limine, I suppose, because it is on an evidentiary matter is both multiple objection and vehement objections. First of all, none of these objections were raised at the time that the testimony and the evidence was introduced. That in and of itself renders the motion without merit, but going beyond that, your Honor, the second thing is that Mr. Curet’s objection is based on a criminal statute dealing with admissibility in a criminal case. Clearly this is a civil case and the statute, Section 32, as the Court well knows, is a criminal section of the statute, and it would not apply. Thirdly, your Honor, if I understand the import of the cases and the statute that Mr. Curet bases his objection to this evidence already admitted, is that Dr. Maxwell in extracting this blood from the body of Kirk McLaughlin in some kind of way did it contrary to this statute. If indeed that is true and if indeed the statute applies, the remedy is not to exclude the admissibility or the inadmissibility of the evidence in this civil trial. The remedy is, of course, for Mr. and Mrs. McLaughlin to either sue Dr. Maxwéll or to bring a criminal action against Dr. Maxwell for doing something in violation of that statute or to their detriment. The admissibility of this evidence, as the Court will hear from an expert to testify later this afternoon, was valid because it was done in accord with good medical practice. The consent issue and all of that is an entirely different matter and one that can and perhaps should be resolved by Mr. and Mrs. McLaughlin and Dr. Maxwell at a later date. My objections are again multiple *337 and vehement, and I think that clearly, clearly the evidence is admissible, the chain of evidence will be shown to have been valid, and the ultimate effect of this blood alcohol reading will be left to the jury to decide as to whether or not it is applicable, whether or not it is determinative of the issue of liability.
THE COURT:
The Court is going to take that question under advisement. I want to hear the rest of the testimony and I will review those records tonight and tomorrow morning. Let’s proceed. Bring the jury in, please.
[[Image here]]
[Stanley S. Chigoy, the technologist who tested the hlood sample, was the next witness. His testimony was, in pertinent part, as follows:]
BY MR. BREEDLOVE:
Q Mr. Chigoy, directing your attention to the date of April 10 or 11, 1983, what was your capacity at The Pathology Lab at that timeframe?
A It was the same as it is now, assistant administrator and as well as the supervisor of the toxicology laboratory.
Q On or about that date, have you had a chance to review The Pathology Lab records in order to determine whether or not The Pathology Lab received a blood sample from Dr. Ralph Maxwell in connection with the examining—
MR. CURET:
Your Honor, I have to object to the witness giving testimony as to what someone else did. It calls for—
MR. BREEDLOVE:
I beg your pardon. I am asking him to—
MR. CURET:
Unless I misunderstood you.
MR. BREEDLOVE:
Yes, I think you did. I am asking this witness whether he reviewed his own records at The Pathology Lab.
MR. CURET:
I misunderstood you.
BY MR. BREEDLOVE:
A Yes, my records indicate that we received a specimen in our laboratory and in the toxicology laboratory in specific.
Q I am going to show you, Mr. Chigoy, some documents numbered nine, ten, eleven, and twelve, and beginning with — I beg your pardon, eight, nine, ten, and eleven. They are marked eight, nine, ten, and eleven, and I would like to first direct your attention first to document number eight. Can you identify that, sir, from the records of The Pathology Lab?
A This is one of our standard request forms that we supply to physicians. It is marked with an account number that we give specifically to each physician so that we can keep our records straight. The account number on this particular request form is 1855 which would be Dr. Maxwell.
Q Would that have been the first request or notice or paperwork that would have come in on a blood sample from Dr. Maxwell as the coroner?
MR. CURET:
Objection, your Honor, unless this witness is the one who receives that first notice.
MR. BREEDLOVE:
I think this witness is that person, your Honor.
MR. CURET:
Well, we don’t know that.
THE COURT:
If it is part of the records of the office, he is entitled to testify to that.
BY MR. BREEDLOVE:
Q Let me ask you, Mr. Chigoy. Would you or someone under your direction and supervision at The Pathology Lab be the person that would have received this request slip at The Pathology Lab?
MR. CURET:
Just a moment. Again I would simply make my objection, would that someone be under his direction at the time it was received. I realize he’s got a promotion. BY MR. BREEDLOVE:
A Yes, at that time they would have been under my supervision, yes.
*338 Q Now, Mr. Chigoy, referring to document number eight, does it identify a name for the blood vial that would have come into the lab?
A This particular request form identifies a specimen on a Kirk McLaughlin.
Q And from what doctor do the records indicate it was received?
A By his account number would indicate Dr. Maxwell and on the line it says doctor, it was written Dr. Maxwell.
Q Is there an indication that his account is to be charged for the examination of this blood sample?
A The 1855 is our mechanism for billing.
Q Can you determine from this document on what date your lab would have received this blood sample for examination?
A Yes, down in the lower right-hand corner we stamped it. At this particular time on this type of requisition, we stamped on each day of receipt, the day that we received any particular request, and this one was stamped April 11, 1983.
Q April 11, 1983?
A Yes.
Q Now, Mr. Chigoy, when a blood sample test is requested by Dr. Maxwell or any other physician, how is that blood sample vial transported to The Pathology Lab, if you know?
A We have a—
MR. CURET:
Excuse me. I would like for the witness to confine himself to this particular case, if the Court please.
MR. BREEDLOVE:
Well, this is an expert. He is the administrator of The Pathology Lab, and if you will allow him to answer this question I will bring it down to Kirk McLaughlin’s case.
BY MR. BREEDLOVE:
A Sure. In this particular instance, one of our couriers would have been dispatched during his routine day’s work to pick up a specimen either at Dr. Maxwell’s office or a location specified by Dr. Maxwell to pick up his specimens. He would have picked up this specimen wherever that is, that I can not say, he would have picked it up and transported it back to our laboratory.
Q The next document which is marked document number nine, Mr. Chigoy, can you identify that in accordance with the records at The Pathology Lab?
A This is a copy of the log book that we were using at that time that listed in the toxicology lab the specimens that were received. This particular log book was for blood alcohol tests. It lists the names of the patients as well as the account number of the physician we received them from and the date we received it as well as the results.
Q The block that you are referring to is marked 4/11/83; is that correct?
A Yes, just 4/11. It says 1855 — 4/11 which would indicate the account number and the date.
Q That is in the parentheses after—
A That is in parentheses.
Q —the specimen’s identifying name?
A The name, right.
Q The 1855 is the doctor’s account number; is that correct?
A That is correct. It is easier to write a number than names.
Q And the 4/11 is the date when it was received and analyzed?
A Received in the laboratory, yes.
MR. BREEDLOVE:
Your Honor, in connection with the testimony of this witness, I will offer, introduce, and file into evidence exhibits eight and nine, and call for objection.
[Exhibit D-9 shows “Kirk McGlough-lin’s” blood alcohol as 0.20.]
MR. CURET:
May it please the Court, I object on the basis of this witness not identifying himself as having made these entries in this record. My objection may go to the probative weight of the thing, but he is just saying that he brought a piece of paper from his office and this is it. MR. BREEDLOVE:
Your Honor, we have the administrator in charge of the analyzing and admin *339 istrator of blood samples. If this man can’t answer that question, there is no one on earth that can.
THE COURT:
He has properly identified the record as being a part of the records of The Pathology Lab. Proceed.
MR. BREEDLOVE:
Do I understand the Court’s ruling that the documents are admissible?
THE COURT:
They are admissible.
BY MR. BREEDLOVE:
Q Mr. Chigoy, turning to the next document that is labeled number ten, can you identify that as a copy of the documents that are contained at The Pathology Lab relative to the examination of Kirk McLaughlin’s blood sample?
A This particular document is a graph tracing off of the gas chromatograph that is dated 4/11/83, also bearing the names of the patients that match those in the log book of those specific specimens. Q Does the name McLaughlin appear on the actual graph paper that you have in front of you?
A Yes, it does.
Q And would that name and the dates and the numbers, et cetera as shown on that document conform with and be consistent with the documents that you previously identified?
A Yes, it would indicate such to me.
Q Now, directing your attention to the document marked number eleven that follows, can you identify that as a copy of one of the documents contained in your file at The Pathology Lab relative to the examination and analysis of Kirk McLaughlin’s blood sample?
A Yes, this is a copy of—
MR. CURET:
If it please the Court, I have to object. I believe there was a mispronunciation of the name. Your Honor, has the bench book there, that does not seem to be Kirk McLaughlin to me.
[The name on Exhibit D-ll is “McSloughh, Kirk”.]
MR. BREEDLOVE:
I don’t understand the objection.
MR. CURET:
Well, you have the document.
MR. BREEDLOVE:
I do.
MR. CURET:
There is a person’s name on the document and you said Kirk McClaughlin’s blood sample.
MR. BREEDLOVE:
If I mispronounced Kirk McLaughlin’s name, your Honor, I apologize to the Court and the jury. I think we all know who we are talking about.
MR. CURET:
I am going to object to the introduction of that particular piece of evidence on the basis of the question being leading, your Honor, because that name is not on this document.
MR. BREEDLOVE:
Your Honor, we haven’t gotten to the admission of the document yet.
THE COURT:
It hasn’t been offered yet. I am not sure that I understand. I haven’t looked at the document yet. Go ahead.
MR. BREEDLOVE:
Okay. We are referring to number eleven, your Honor.
BY MR. BREEDLOVE:
Q Mr. Chigoy, document number eleven, I think Mr. Curet's problem and his objection, as I understand it, is to the spelling of the patient’s name, and I direct your attention to the name spelled out after the colon. Would you tell me, well, I don’t want to belabor this, your Honor, with the spelling. Is that the correct spelling of the name; is it a typographical error?
A I would assume it is a typographical error. It is an interpretation by a keypuncher of the handwritten spelling on document number eight.
Q Is there any other identifying number or name or mark or anything else that you at the lab use to more accurately identify this result with the other doc *340 uments relative to the examination of Kirk McLaughlin’s blood sample?
A Yes. The lab number in the upper right-hand corner 471585 is the unique accession number assigned to that specimen and placed on the request slip, and this is unique to this particular request slip and whatever samples came in at that exact time.
Q At the lab, do you rely primarily on the spelling of the names of either the patient or the physician or the assigned numbers to the vials?
A We have to rely mainly on the accession numbers. These request slips come in handwritten, and the writing is often hard to understand so we have to rely on an accession number that we can track through the lab that is a lot more easier to read.
Q I note that the physicians name is Mad-well, for example.
A Right, again a typographical error.
Q Below that is an account number?
A Correct.
Q Is that Dr. Maxwell’s account number, sir?
A Yes, it is.
Q I notice that there is a date on this blood sample result.
A Yes.,
Q What is that date, Mr. Chigoy?
A That is,the date that the specimen was received in our laboratory.
Q And is that date consistent with the previous documents and your examination and evaluation of the blood sample of Kirk McLaughlin?
A Yes, it is.
MR. BREEDLOVE:
Your Honor, in connection with the testimony of this witness, I offer, introduce, and file into evidence exhibits ten and eleven, and call for objection
[Exhibit D-10 shows “McGloughlin’s” blood alcohol level at 0.204. Exhibit D-ll shows a blood alcohol level of 0.204, rounded off to 0.20.]
MR. CURET:
I reurge the same objection, your Hon- or. If the Court will notice the particular piece of evidence called exhibit eleven, the document does not bear the name of Kirk McLaughlin. They tried to explain it away, but I am sure that the witness is not the person who is able to testify as to how that occurred there. That may be an opinion of his, but this is a Court of law where we are dealing with good hard evidence, and I object to the introduction of that until this is satisfactorily explained.
MR. BREEDLOVE:
Your Honor, in response, Mr. Chigoy has explained his position at The Pathology Lab. He has explained the identifications, the dates, what the graph and what this exhibit represents in the course of the examination of the blood sample. THE COURT:
I think a satisfactory explanation has been made of the name. It is a mere case of misspelling. The lab number is correct and the physicians number or account number is correct. I am going to admit it.
BY MR. BREEDLOVE:
Q Mr. Chigoy, I have some questions as to, first of all, how this blood sample was analyzed and ultimately the results. Can you tell me, having introduced the documents and refer to them, the ones that are in front of you, what you do at The Pathology Lab — first of all, did you take part in the analysis of this blood sample?
A Our records indicated that I was the one who actually performed this test.
Q So that in addition to being the administrator, conveniently you in the course of your actual bench work at The Pathology Lab, were indeed the person who actually performed the test on this very blood sample; is that correct?
A On this one, yes, that is correct.
Q Would you tell me and explain to the jurors what you as a medical technologist, trained in your field, would do and how you go about testing this blood sample?
A The method that we use for determining blood alcohol or ethanol more specifi *341 cally is called a head-space method. The test is performed on a gas liquid chroma-tograph. We take a specimen of blood, virtually any specimen. This one was a specimen, our records indicate this was a blood specimen. It was taken and put into a reaction vial, mixed with an internal standard, and then a catalyst, in this case, in the case of blood alcohol, sodium chloride, or ordinary table salt was added, the vial was shaken, and incubated at 45 degrees Centigrade for 20 to 30 minutes; then, the term for this technique, head-space, indicates the alcohol or ethanol was liberated from the blood, and is now in the air or the space, the head-space, at the top of the vial. We inject through the rubber stopper with a syringe and needle, pull out some of that gas, and inject that gas into a gas liquid chromatograph. The tracings when it comes out of the chromatograph, it was exhibit number ten, we take and we measure these. We compare them against a standard and from that we determine an actual level in milligrams per deciliter.
Q Mr. Chigoy, for those of us who are not medical technologist, and can not fully appreciate all of what you just told us, in lay terms the result of this type of test is to accomplish what, sir?
A This is to identify or separate the various volatiles or different types of alcohols, ethanol, methanol, isopropyl alcohol, as well as various other ones, acetone. The method will separate them out into individual peaks on our graph so that we can tell one from the other.
Q And when you get the results from this test, can you determine the blood alcohol content of a person’s bloodstream?
A Yes. This is equivalent to the blood alcohol content in the person at the time it was drawn.
Q And if a person had been drinking alcohol, and that alcohol remained in the person’s bloodstream when this sample was taken, would your test conclusively show the amount of blood alcohol in that bloodstream?
A At the time it was drawn, it would indicate the amount of alcohol or ethanol present in someone’s blood at that time.
Q Now, Mr. Chigoy, so that the jurors are not confused, when you use the term alcohol and ethanol, are you suggesting, sir, that there is a reading that we get or you get that shows that you are unable to distinguish between the amount of alcohol as opposed to ethanol or are we talking about really the same thing?
A We are talking about the same thing. There are other alcohols methanol, iso-propyl. The report form, I believe, says blood alcohol or alcohol blood and it says ethanol in parentheses indicating that it is specific for ethanol.
Q The procedure and test that you describe, Mr. Chigoy, is that what we call a state of the art test, that is, the best available test, the most accurate available test that is known to science today for the testing of blood alcohol?
A We feel at The Pathology Laboratory it is the most accurate method available.
Q Mr. Chigoy, as the person that performed the test in this case, and referring to the documents that you referred to, can you tell the jurors the reading of the blood alcohol content as a result of the test that you performed?
MR. CURET:
I object, your Honor, for the reasons stated earlier. I object that this test or the testing procedure which he used while the device may be acceptable was not done according to the law of Louisiana in this particular test. It requires a reputable test.
MR. BREEDLOVE:
Your Honor, I first of all object to counsel bringing up a motion in limine in the presence of the jury, and I request that the Court instruct the jury that this question that was raised was a matter to be raised outside of the presence of the jury. Secondly, the reference to documents previously admitted is moot at this point.
THE COURT:
Well, I don’t think there has been any damage done. The jury has not been aware of anything that was done out of the presence of the Court. I believe that *342 the results of the test are admissible, and I am going to admit it.
BY MR. BREEDLOVE:
Q What was the blood alcohol reading for this test?
A Two hundred and four milligrams per deciliter.
Q And would you interpolate that for the jury, Mr. Chigoy,- into terms of percentage of blood alcohol?
A That would be 0.20 percent.
Q Mr. Chigoy, in reviewing the records that are before you and the test that you performed, is there anything unusual or out of the ordinary from all that you know and from all that you can see as to how this blood sample was tested or the custody by which it was transported to your lab?
A No, there is nothing to indicate that.
[Bolding added.]
[Underscoring added.]
*343 APPENDIX B
[[Image here]]
*344 [[Image here]]
*345 [[Image here]]
*346 [[Image here]]

. Plaintiffs also sued the State of Louisiana, through the Department of Transportation and Development. Plaintiffs presented no evidence as to the negligence of the state, and the trial court granted a directed verdict in favor of the state at the close of all the evidence. Plaintiffs do not complain on appeal of the judgment in favor of the state; that judgment is now final.

. A “yaw mark” is an arc-shaped deposit of tire rubber left on the highway by a vehicle which is traveling in a forward direction but is simultaneously swerving or sliding sideways.

. The trial court judge was not called upon again to rule on this objection, and the record contains no specific ruling on this point. However, La.R.S. 32:661 et seq. is not applicable to civil actions. La.R.S. 32:662(C); Parker v. Kroger’s, Inc., 394 So.2d 1178 (La.1981).

. Because the chain-of-custody objection was not properly presented to the trial court or this court, it is unnecessary for us to rule upon it. Compare Bufkin and the cases cited therein with State v. Turner, 392 So.2d 436 (La. 1980: State v. Dotson, 260 La. 471, 256 So.2d 594 (1971); State v. Coleman, 254 La. 264, 223 So.2d 402 (1969).

. Assignment of error number 5 was decided in the original appeal adversely to the plaintiffs and has not been reurged in this remand.